**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GEORGE J. CORBETT,        :
        :    Civil Action No. 05-3429 (WJM)
       Petitioner,   :
        :
       v.       :    **OPINION**
        :
RONALD H. CATHEL, et al.,    :
        :
       Respondents.  :

**APPEARANCES:**

Petitioner pro se
George J. Corbett
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Counsel for Respondents
Daniel I. Bornstein
Deputy Attorney General
Ofc. of the NJ Atty. General
Division of Criminal Justice
Appellate Section
P.O. Box 086
Trenton, NJ 08625

**MARTINI**, District Judge

    Petitioner George J. Corbett, a prisoner currently confined at New Jersey State Prison, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Ronald H. Cathel and the Attorney General of the State of New Jersey.

    For the reasons stated herein, the Petition must be denied.

## I.   BACKGROUND

### A.   Factual Background

It is undisputed that on September 14, 1994, Petitioner killed Christopher Shrimpton by firing a single .22 calibre rifle bullet into his chest.  At the time of the killing, Shrimpton was 14 years old; Petitioner was 20.

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> We need not recount the facts at length.  The State presented compelling evidence of defendant's guilt.  Among other things, the State's proofs disclosed that (1) defendant had twice engaged in criminal conduct with the victim, Chris Shrimpton, (2) that on both occasions Shrimpton had informed the police of defendant's complicity in the crimes, (3) that defendant had repeatedly told others he intended to seek revenge against Shrimpton, (4) that, consistent with these threats, defendant fired a shot into Shrimpton's bedroom, (5) that the subsequent killing of the victim occurred in the presence of nine witnesses, each of whom testified at trial, (6) that defendant fled to New York City immediately after the murder, (7) that upon his arrest defendant told the police where they could find the murder weapon, (8) that the rifle was discovered by the police in the location described by defendant, and (9) that ballistics evidence established the bullet recovered from the victim's body was fired from the rifle.  In short, the voluminous record fairly reeks of defendant's guilt.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

(Re3, Opinion of Appellate Division, at 2-3.)

B.    Procedural History

Following a jury trial in the Superior Court of New Jersey, Law Division, Middlesex County, Petitioner was found guilty on April 18, 1996, of murder, N.J.S.A. 2C:11-3a(1) and (2), and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a.  On May 24, 1996, Petitioner was sentenced to life imprisonment with a thirty-year parole disqualifier.  In addition, the trial court imposed a consecutive four year sentence based upon defendant's violation of probation on an unrelated prior conviction.

By Opinion filed February 17, 1999, the Superior Court of New Jersey, Appellate Division affirmed the conviction and sentence.  (Re3.)  On May 26, 1999, the Supreme Court of New Jersey denied certification.  (Re5.)

Petitioner then filed a timely motion for post-conviction relief in the trial court.[2]  The trial court denied relief. (Re23.)  By Opinion filed November 5, 2004, the Appellate Division affirmed the denial of relief.  (Re11.)  The Supreme Court of New Jersey denied certification by Order filed January 28, 2005.  This Petition followed.  Respondents have answered and this matter is now ready for disposition.

---

[2] The date that Petitioner filed his motion for post-conviction relief is not revealed in the record supplied to this Court.

3

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an

4

unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). <u>Id.</u> at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. <u>Id.</u> at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. <u>Matteo v. Superintendent</u>, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. <u>Chadwick v. Janecka</u>, 302 F.3d 107, 116 (3d Cir. 2002) (<u>citing</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. <u>See</u> <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL

1523144, *6 n.4 (D.N.J. 2000).  <u>See also</u> <u>Schoenberger v. Russell</u>, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Lambert v. Blackwell</u>, 387 F.3d 210, 260 n.42 (3d Cir. 2004); <u>Lewis v. Pinchak</u>, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989);

United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),

cert. denied, 399 U.S. 912 (1970).]

III.   ANALYSIS

A.   Right to Present A Defense

"'[S]tate and federal rulemakers have broad latitude under

the Constitution to establish rules excluding evidence from

criminal trials.'" Homes v. South Carolina, 126 S.Ct. 1727, 1731

(2006) (quoting United States v. Scheffer, 523 U.S. 303, 308

(1998); also citing Crane v. Kentucky, 476 U.S. 683, 689-690

(1986); Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983);

Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973); Spencer v.

Texas, 385 U.S. 554, 564 (1967)).

> This latitude, however, has limits. "Whether rooted
> directly in the Due Process Clause of the Fourteenth
> Amendment or in the Compulsory Process or Confrontation
> clauses of the Sixth Amendment, the Constitution
> guarantees criminal defendants 'a meaningful
> opportunity to present a complete defense.'" Crane,
> supra, at 690, 106 S.Ct. 2142 (quoting California v.
> Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81
> L.Ed.2d 413 (1984); citations omitted). This right is
> abridged by evidence rules that "infring[e] upon a
> weighty interest of the accused" and are "'arbitrary'
> or 'disproportionate to the purposes they are designed
> to serve.'" Scheffer, supra, at 308, 118 S.Ct. 1261
> (quoting Rock v. Arkansas, 483 U.S. 44, 58, 56, 107
> S.Ct. 2704, 97 L.Ed.2d 37 (1987)).
>
>     ...
>
>     While the Constitution thus prohibits the
> exclusion of defense evidence under rules that serve no
> legitimate purpose or that are disproportionate to the
> ends that they are asserted to promote, well-
> established rules of evidence permit trial judges to
> exclude evidence if its probative value is outweighed

by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. ...  Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" <u>Crane</u>, <u>supra</u>, at 689-690, 106 S.Ct. 2142 (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); ellipsis and brackets in original).  <u>See also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

<u>Homes v. South Carolina</u>, 126 S.Ct. at 1731-33 (citations omitted).

   Violations of the right to present a defense are subject to harmless error review.  <u>See</u>, <u>e.g.</u>, <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 680-84 (1986); <u>Savage v. District Attorney of the County of Philadelphia</u>, 116 Fed.Appx. 332 (3d Cir. 2004) (unpubl.).

      The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge. [footnote] ...

      But the right is not absolute.  The Sixth Amendment requires more than a mere showing by the accused that some relevant evidence was excluded from his trial.  Rather, the accused must show how that testimony would have been both <u>material</u> and <u>favorable</u> to his defense. ... [E]vidence is material: "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." ...  In [<u>United States v. </u>]Bagley, [473 U.S. 667 (1985), ]the Court further refined the materiality definition by noting that, "[a] 'reasonable probability' is a probability sufficient to undermine

confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.

In sum, for [a defendant] to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose. Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).

Government of the Virgin Islands v. Mills, 956 F.2d 443, 445-46

(3d Cir. 1992) (footnote omitted).  The Court of Appeals noted

that some courts analyze such claims under the Due Process Clause

and that there is little, if any, difference in the analysis.

Mills, 956 F.2d at 445 n.4.

Here, Petitioner alleges three separate deprivations of his

right to present a defense: (1) the denial of the right of cross-

examination on the issue of bias, as evidenced by an alleged

conspiracy to shoot Petitioner, (2) the refusal to order

disclosure of a confidential informant who may have had

information about the alleged conspiracy to harm Petitioner, and

(3) the denial of the request to present demonstrative evidence

of Petitioner's left-handedness.  Each will be addressed in turn.

Both the claim that Petitioner was deprived of his right of

cross-examination and the claim that he should have been given

the name of a confidential informant arise out of information

received during the trial that suggested that two witnesses might

9

have been involved in the theft of guns for the purpose of harming Petitioner.  (Re15, Transcript of April 3, 1996, at 211-21; Re16, Transcript of April 4, 1996, at 118-214.)

The trial court refused to permit defense counsel to impeach the credibility of witnesses Scott Lipinski and Nigel Shrimpton, brother of the victim, by questioning them about their involvement in the alleged conspiracy to shoot Petitioner in court.  In addition, the trial court refused to compel disclosure of the identity of a confidential informant involved in the police investigation of the alleged conspiracy.  Petitioner contends that these decisions deprived him of his Sixth Amendment right to confront the witnesses against him and of his Fourteenth Amendment right to due process.

Following a hearing during which the court heard testimony from the officers involved in the investigation of the gun theft, the court denied both the request to cross-examine these witnesses on the subject of their involvement in the alleged conspiracy to harm Petitioner and the request for the identity of a confidential informant involved in the investigation.

> THE COURT: Leaving aside some of the rhetoric of this, trial courts are confronted yearly today with difficult decisions.  Trial courts are sworn to uphold the law.  Trial judges take very seriously their responsibility to provide a fair trial to both sides, being the people of the State of New Jersey are entitled to a fair trial and the defendant is entitled to a fair trial.  But I suppose if there's a conflict between the two then obviously the rights of the defendant are paramount.

Now, this Court has heard that, in fact, bias is
one way that witnesses can be impeached, and counsel
has presented to the Court the case of State versus
Smith.  I think that dates back to 1968.  But I think
it's good -- still good law.  In that case the
Appellate Division overturned the trial court's because
of the trial court's refusal to permit defendant to
cross-examine the State's principal witness on the
issue in an attempt to show bias on other -- and also
overturned the judge because of other constrictions
that the place -- the judge placed upon the defendant's
right to present evidence.

But that case, as this case, turns on the facts
and anybody who has been in my courtroom more than once
knows that the facts weight heavily with me.  We can
enunciate broad principles and all we want to but we
must look at the underlying facts.  And State versus
Smith we had a -- the State's principal witness was a
police detective, and the defendant alleged that that
police detective in the process of arresting him for
that -- for the crime for which he was on trial beat
him up.  He beat him up.  He took him to a garage.  He
went up on a lift and beat him up some more.

Now, defendant was permitted to ask the officer
about whether he did such a thing and the defendant --
and the police officer, as might be expected, denied
it.  It was highly unlikely that he was going to say,
yeah, I beat him up to this extent or maybe he was
going to say that he hit him once or twice because he
attempted to escape or whatever they say.  But he
denied it.

Thereafter the defendant took the stand, talked
about the beatings and tried to present extrinsic
evidence of his complaints that he made to the police
department and I believe to some of the superiors.  The
-- the hospital records and the judge wouldn't let him
make his case, wouldn't let him show the -- that the
police officer had bias, and the police -- the judge
was wrong int hat case and clearly wrong in that case.

Please know, and for the benefit of any reviewing
court, the facts in this case nowheres near approach
the facts in State versus Smith.  The facts in this
case are that -- and again I -- I am not going to -- I
am not going to find as the finder of fact because I'm

not truly the finder of fact in this case, the jury is.
But starting with the - with the proposition of -- that
I'm not going to find the facts, that the jury will
eventually.

        Suffice it to say, there have been a number of
witnesses, approximately nine or ten witnesses who
testified to seeing the defendant shoot Chris
Shrimpton, a fourteen year old boy, in the heart with a
single shot .22 caliber rifle.  Now, I don't have any
problem if the jury wants to decide that the State
hasn't met its burden in showing that first element of
the offense that George [Corbett] didn't shoot him, but
it looks to this Court that there is sufficient
evidence at this juncture for the jury to find that
element that, in fact, the defendant shot [Chris]
Shrimpton on September 14th of 1994.

        Now, the issue that has presumably been joined
between the parties -- and I don't mean to speak for
the parties, but the Court sat and listened to the
opening statements and might reasonably be assumed that
the issue did the defendant know what he was doing?
And did he intend the consequences of his acts when he
did it?

        And to that end the State has presented a number
of witnesses who spoke about a feud between the victim
and the defendant.  The victim is alleged to have I
think that the vernacular word is ratted him out.  That
is told the police or that -- that the defendant was
implicated in some car burglaries and that the
defendant took umbrage with that.  I make no findings
of fact about whether the defendant did, in fact,
participate in those -- those car burglaries.  It is
totally irrelevant.

        The only reason they were admitted was on the
issue of the defendant's intent and motivation because
numerous witnesses testified that, in fact, Mr. Corbett
had expressed his unhappiness with the victim and that
at some time he indicated that he would like to do him
harm.

        Now, Nigel Shrimpton the defendant's brother
testified and a relative of the victim I suppose is --
comes before the Court with some fair inference of
bias.  To begin with he's the victim's older brother.

                            12

He's the one who lives in the household where his
brother is gone.  He's the one who shares his mother's
anguish or at -- is at least subject to it over this
time.

     So without having said a word of cross -- without
being conducted a word of cross-examination, defense
counsel could very, very well stand up and argue before
this Court to disregard the testimony of Nigel
Shrimpton.  Look where he's coming from.  He's the
defendant's brother.  The defense counsel did a more
than adequate job of cross-examining Mr. Shrimpton.
Defense counsel pointed out inconsistencies in Mr.
Shrimpton's sworn statement to the Old Bridge police
taken within hours of the shooting.

     Mr. Kenny, as I said, was given an opportunity to
ask the -- the witness whether, in fact, he had any
bias.  Did he like George?  Isn't it a fact that he
like to see the defendant suffer for what he did and et
cetera, et cetera.  I don't recall him asking those
specific questions but he certainly had the opportunity
to do that.

     If Nigel Shrimpton's testimony is to be
distinguished from anybody else's testimony it was in
the area where he indicated that he had a conversation
with the defendant within a short time prior to the
shooting, and by a short time I would have to go back
and look at my notes, but within an hour or so of -- of
this shooting when Nigel is alleged to have said
something to the defendant about you know what's the
deal with my brother?  Or why don't you make up or call
this quits?  And the defendant is alleged to have
responded is your brother's life worth six months?
Implying that he might have to do six months in jail.

     Now, that testimony is unique.  It's the only
testimony that's unique.  That is, unique to Mr.
Shrimpton.  And it may be that -- it may be that the
jury is going to focus in on -- on that testimony to
the exclusion of all of the others, and that may be the
crucial bit of testimony that would incline the jury to
convict.  I don't think so.

     But what I want to put on the record is that Nigel
Shrimpton is not the State's key witness in this case.
He is not the one who is holding the -- the defendant

hostage in this regard because he is the one who can
identify him as the shooter, anything of that nature.
It's not there.

Now, conceding the defendant's right to cross-
examine on the issue of bias, the defendant must have a
good faith basis in that regard, and I don't think I
have to cite case law on the matter.  I can.  But I
think that that's patently clear to both sides.  The
defendant says, yes, I have a good faith basis because
of what was told to me by the Court that Detective
McGovern who is the investigating officer in this case
passed on to the Court a concern that the Court be
aware that there -- there were initially two guns and
that turns out not to be true.  They appear that the
Old Bridge police always knew where the one gun was
because it was turned over by the mother of the boy who
had it.

So the information I got in that regard was not
entirely true, that there were two guns floating around
out there.  But he told me that there [were] two guns
out there, not to worry because the guns have now been
recovered, but that -- because I took notes from
Detective McGovern when he read it.  That initially the
guns were taken from a police officer in Jersey City.
Scott Lipinski either turn the guns over to the police
department or Scott Lipinski told the police officer
where the guns were and that Nigel Shrimpton's name was
mentioned, that they did receive one gun from Scott
Lipinski, and one gun was obtained from another
juvenile and that this investigation started from
information contained on the street.

Detective McGovern also said in response to my
question, no one has been arrested at this time and
there are no admissions made by anyone.  I asked the
question because I thought if there were admissions or
there was a statement defense counsel might have the
right to know about it.  I mean depending upon what it
said.

I was very aware that this could involve this
trial in some way.  I was very aware that it could
somehow effect the security of this court.  I
immediately shared with counsel my concerns.  I must
say that all of us were a little lighthearted about
that at -- at that time.  It was sort of -- you know --

14

this conspiracy theory, maybe they are going to bring
the guns into court, maybe there is going to be a
shootout and things like that.

But it was not until defense counsel indicated
that he wished to question Scott Lipinski on the stand
about this that I stopped counsel for the reason that
Scott Lipinski was sixteen years of age and should not
be asked under oath whether, in fact, he engaged in any
crimes without having his parents here and without
being informed fully of his right to remain silent, his
right to counsel, his right to be informed of any
charges against him.  So, I stopped that right -- right
at the onset and I did indicate that I would have a
hearing, and we indeed did conduct such a hearing
today, and I did hear the testimony of Detective ...
John Doherty, a member of the Old Bridge Police
Department who was the investigating officer in this
matter.  He did confirm that there was a theft of two
weapons from the Jersey City police officer and that
occurred on March 30th of 1996, and [how] Old Bridge
Police Department came to know of the -- of the theft
is that they received a telephone call from -- from a
woman, a citizen Diana -- Diane -- ... Diauto.  And Ms.
Diauto indicated that her son David had a gun in his
room.  That gun had been turned over to her by her nine
year old son. ...  The police questioned her son.

The police also spoke to the boy's father who is
apparently either divorced or separated from his mother
and living with I could say fellow officer but living
with a woman officer, and it was actually the woman
officer who was in -- who was the owner of -- of -- of
the guns.

The sixteen year old son David was -- was
questioned on Monday, that on tape under oath and it
was, in fact, transcribed.  David was asked about the
second gun that was stolen, the .25 caliber gun and
David said that he believed the gun was with Scott
Lipinski, that he sold it to Scott Lipinski for the
amount of ninety dollars.

Subsequently Scott was questioned, said that he
took it out and to the area near Duhernal Lake, fired
two shots from it and then somehow passed it on,
whether it was -- it was sold or just turned over for
nothing, I don't know, but it was turned over to a

white male, long brown hair, age approximately twenty to twenty-five, and the testimony before the Court is that the police eventually recovered the gun because they had a confidential informant.  Apparently somebody who knows all of the actors who knows these young people down in Old Bridge, and the confidential informant said that he could get the gun.

I heard the testimony of Detective Charles Miller who has had a relationship with this confidential informant.  The confidential informant -- well, I believe that it was David who was asked who might have the gun.  Names were mentioned.  Nigel Shrimpton, Scott and the confidential informant's name was mentioned. The confidential informant eventually got -- recovered the gun, turned it over to the police officers, and the police officers at this point say that their investigation is essentially completed except for the making of some reports.

I do understand that Mr. Kenny ... thinks that the police could have gone out and done a more in depth investigation not to recover the weapons, not to determine their whereabouts but to determine whether, in fact, Nigel and Scott ever -- well, we know Scott had possession of it.  But did Nigel have possession of it?  Did Nigel want possession of the gun and if, in fact, Nigel wanted possession of that gun not to rob Nicola's pizzeria but to bring it into court to assault the defendant in this court?

Well, it might be interesting to know.  I'm not sure about how one goes about getting that information if that's something that is known only to Scott and -- and Nigel.  I do recognize that police officers consistent with the constitution are limited in getting confessions of crimes.  I suppose they could go out and ask them whether, in fact, they are engaged in a conspiracy to commit murder.  After having given them their rights I do recognize that Scott Lipinski is sixteen and -- and Mr. Shrimpton, Nigel Shrimpton is eighteen years of age.

I am satisfied at this stage that there has not been a sufficient showing for this Court to direct Old Bridge police officers to do further investigations because I'm not sure of what investigations I should order them to do.  I'm not a trained detective.  I -- I

16

suppose I could tell them to go speak to Nigel or to
back to the confidential informant and -- or go back to
Scott recognizing they've already spoken to Scott, and
there's some question about whether Scott has been
entirely forthcoming with them.

But true -- in truth I'm not sure of the Court's
authority in this matter, and I'm at this point not
satisfied that a sufficient showing has been made that
I can supersede the department, order further
investigation, because, as I said, I don't know what
investigation might prove fruitful.

I went -- understand the difficulty of proving the
negative in this case.  Proving that there was no
conspiracy.  I can't imagine that the officers could
ever present enough evidence to satisfy the defendant
that there was no possibility whatsoever that there was
any conspiracy, any intent to harm -- to harm the
client, and I don't know what the police officers can
do.

So, while I can appreciate defense counsel, I
think from perhaps an opportunity to bring the
[witnesses] back to question them about any possible
bias in that regard might have slipped through their
fingers.  I can't find that that in any way
jeopardizing the defendant's right to a fair trial in
this regard.

I make this statement at length for the review of
any Appellate Court.  I defer to -- to the wisdom of
some judges who are not in the difficult position that
this Court is in of trying to make this decision during
a trial such as this, because this Court has long
thought long and hard about the ramifications of my
decision and the possibilities of trying to impeach a
juvenile witness or even an adult witness by
questioning them about a serious crime that they may
have committed without having -- giving them access to
counsel and seeing whether they wish to avail
themselves of their Fifth Amendment rights.  And I'm
not sure where we're going with this case.  I'm
satisfied at this point that a thorough investigation
has been done by the Old Bridge Police Department and
to what they were going to investigate.  I will go no
further.

17

Mr. Kenny, I leave you to whatever resources you have.

...

MR. KENNY: Yes. ...  I also do wish to supplement the record, however, that when we spoke on Tuesday morning the Court had informed us in addition to what you had stated on the record that the word on the street was at least as you understood it and explained it to us was that the purpose for which Scott Lipinski and Nigel wanted to get these guns related to this court and my client and that's what prompted the -- the discussion about increased security.

We had the sheriff's officers increased security. In fact, you had given a direction to the prosecutor to see if they could get one of their investigators to be in the hallway while the kids were there and make sure they were [not] in the bathroom too long nothing was passing and exchanging weapons and things like that for the securities of all of us which made good common sense.  But that was the knowledge that I had at the time when I sought to do my examination.

The knowledge that we have has been supplemented today in this 104 hearing which is why we saw the two detectives who have come.  The knowledge is a little bit different than that we have, but in light of what the Court has found the facts to be insufficient because of the state of the investigation. ...

But what was not investigated was whether or not Nigel and -- and Lipinski -- Nigel Shrimpton and Scott Lipinski were involved at all in an effort to have those guns for the purpose of what Sergeant McGovern originally thought they might be trying to get the guns for, and therefore what I am asking this Court to do is two things.

I am asking this Court to have the detectives, number one, if they know the name or can obtain the name of this mystery person who had possession of the gun after Scott Lipinski and who evidently gave the gun to the confidential informant, to give that name to me, to you, to someone, and if there is a reason why they don't at least tell us what the reason why they don't want to give us that name is, if it's another

18

confidential informant on the record can be clear that
that's why we're not getting it.

Some sort of that first request is that they give
the name of the confidential informant so that at least
what resources I have available to me we can do what
investigation we can if the police aren't going to do
it to see if he can uncover any evidence that would be
sufficient to again present to the Court what new
information we have in an effort to try to prove the
bias or whatever might come out as a result of that
investigation.

Second to that, I am informing the Court is that
we were only informed of this and the detectives will
confirm that this series of events happened this
weekend, and Monday of this week and Tuesday was the
day ... the trial was really to start in earnest and
openings and the taking of testimony, which is what
happened.

I am at a terrible disadvantage.  If that
information is out there and hasn't yet been uncovered
because it hasn't been fully explored and investigated
it is to the prejudice of my client.  Therefore I am
asking the Court for the appropriate amount of time to
allow me to see, number one, if I can get an
investigator, and, number two, to get an investigator
out there to follow up these leads.

THE COURT: If you are asking me to adjourn this
trial and to delay the trial for an indefinite period
of time while you go out and try and quote investigate
this -- this lead the answer is no.  I mean you have
the weekend.  Tomorrow is Good Friday.  We are off.
You have Friday, Saturday, Sunday. ... [T]his trial is
going to continue on Tuesday morning.

        ...

MR. KENNY: Is your Honor going to indicate whether
or not they are going to give me the name of the
confidential informant?  And if they are going to have
the confidential informant give the name to them of the
person, the mystery person who had the gun in between
Scott Lipinski and the confidential informant?

THE COURT: What is the position of the police department, Detective Miller?

DETECTIVE MILLER: I'm sorry.

THE COURT: What is the position?  There has been a request for the name of the confidential informant.

DETECTIVE MILLER: I would wish not to reveal it.

THE COURT: I'm sorry.

DETECTIVE MILLER: I wish not to reveal who it is.

THE COURT: Do you have any concerns for the confidential informant's safety?

DETECTIVE MILLER: Sure I do.  That is why I don't want to reveal who it is.

THE COURT: Is the confidential informant an adult or a juvenile?  Can you tell me that?

DETECTIVE MILLER: I believe he is an adult.  I believe he is an adult.

THE COURT: Without a showing of need at this point I'm not going to direct the Old Bridge Police Department to turn over the name of their confidential informant.  I think that the confidential informant has provided the police with a valuable service.  He's been useful in the past.  They have some concern for his safety and I'm not going to order them to turn it over.

(Re16, Transcript of April 4, 1996, at 195-214.)  The record does not reflect that Petitioner's counsel returned to the court with any further request to cross-examine based on his own investigation.

The Appellate Division denied these claims without comment. (Re3 at 2, 11.)

1.   <u>Cross-Examination as to Bias</u>

"The main and essential purpose of confrontation is <u>to</u>
<u>secure for the opponent the opportunity of cross-examination</u>."
<u>Davis v. Alaska</u>, 415 U.S. 308, 315-16 (1974) (emphasis in
original).  The Supreme Court has recognized that:

> "the exposure of a witness' motivation in testifying is
> a proper and important function of the constitutionally
> protected right of cross-examination."  <u>Savis</u>, <u>Supra</u>,
> at 316-317, 94 S.Ct., at 1110 (citing <u>Greene v.</u>
> <u>McElroy</u>, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3
> L.Ed.2d 1377 (1959)).  It does not follow, of course,
> that the Confrontation Clause of the Sixth Amendment
> prevents a trial judge from imposing any limits on
> defense counsel's inquiry into the potential bias of a
> prosecution witness.  On the contrary, trial judges
> retain wide latitude insofar as the Confrontation
> Clause is concerned to impose reasonable limits on such
> cross-examination based on concerns about, among other
> things, harassment, prejudice, confusion of the issues,
> the witness' safety, or interrogation that is
> repetitive or only marginally relevant.  And as we
> observed earlier this Term, "the Confrontation Clause
> guarantees an <u>opportunity</u> for effective cross-
> examination, not cross-examination that is effective in
> whatever way, and to whatever extent, the defense might
> wish."  <u>Delaware f. Fensterer</u>, 474 U.S. 15, 20, 106
> S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam)
> (emphasis in original).

<u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678-79 (1986).  "[T]he
constitutionally improper denial of a defendant's opportunity to
impeach a witness for bias, like other Confrontation Clause
errors, is subject to <u>Chapman</u> harmless-error analysis."  <u>Van</u>
<u>Arsdall</u>, 475 U.S. at 684.

Here, the trial court knew only that one of the two
witnesses as to whom Petitioner sought cross-examination on bias

21

had had possession of a stolen gun for a few hours before he passed it on to an unknown person and that the word "on the street" was that the two witnesses, including the victim's brother, wanted the gun to use it against Petitioner. Undoubtedly, evidence that the two witnesses harbored sufficient ill will towards Petitioner to want to seriously injure or kill him may have influenced the jury's determination of the credibility of these two witnesses.  As the court noted, however, Nigel Shrimpton's credibility already was subject to challenge based upon his relationship to the victim.  Nevertheless, the only "evidence" of the alleged murder conspiracy was rumor and the fact that one witness had possession of a stolen gun for a few hours before he disposed of it.  In the face of such scant evidence, and the fact that the witnesses would have had to be advised of their right to remain silent as to the alleged conspiracy, it was not error for the trial court to decline to permit the defense to inject this issue into the trial. Moreover, any error that may have occurred clearly was harmless. Here, there were numerous witnesses as to Petitioner's behavior during the evening, when he left the company of his friends at his home, and at the basketball court where he killed the victim. With the exception of the testimony about Petitioner's question whether the victim's life was worth six months, the testimony of the two witnesses was cumulative.  Petitioner had four days to

investigate the alleged conspiracy and did not return to the trial court with any additional information.  There is not a reasonable likelihood that the excluded testimony affected the outcome of the trial.  Petitioner is not entitled to relief on this claim.

    2.  <u>Confidential Informant</u>

The U.S. Supreme Court has recognized a limited "informer's privilege."

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. ...  The purpose of the privilege is in furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.
>
> The scope of the privilege is limited by its underlying purpose.  Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.
>
>     ...
>
> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness.  Where the disclosure of an informer's identity or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.  In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

...

> We believe that no fixed rule with respect to
> disclosure is justifiable.  The problem is one that
> calls for balancing the public interest in protecting
> the flow of information against the individual's right
> to prepare his defense.  Whether a proper balance
> renders nondisclosure erroneous must depend on the
> particular circumstances of each case, taking into
> consideration the crime charged, the possible defenses,
> the possible significance of the informer's testimony,
> and other relevant factors.

Roviaro v. United States, 353 U.S. 53, 59-62 (1957) (citations
and footnotes omitted).  See also McCray v. Illinois, 386 U.S.
300, 311 (1967).

Thus, "the first step in determining whether the identity of
an informant must be disclosed is to ascertain what need, if any,
the defendant has alleged for disclosure.  The burden is on the
defendant to show the need for disclosure."  United States v.
Jiles, 658 F.2d 194, 197 (3d Cir. 1981), cert. denied, 455 U.S.
923 (1982) (citations omitted).  "The mere speculation that an
eyewitness may have some evidence helpful to defendant's case is
not sufficient to show the specific need required by Roviaro."
Jiles, 658 F.2d at 197 (citations omitted).  Once a defendant
establishes a specific need for disclosure, the Roviaro balancing
test comes into play.

> When applying this test, one of three types of
> cases may emerge. ...  First, the court may be
> presented with an extreme situation, such as that in
> Roviaro itself, in which the informant played an active
> and crucial role in the events underlying the
> defendant's potential criminal liability.  In these
> cases, disclosure and production of the informant will

24

in all likelihood be required to ensure a fair trial.
At the other end of the spectrum, are the cases in
which the informant was not an active participant or
eyewitness, but rather a mere tipster.  In such cases,
courts have generally held that the informant's
identity need not be disclosed.  A third group of cases
falls between these two extremes and it is in this
group that the balancing becomes most difficult.

Jiles, 658 F.2d at 196-97 (citations omitted).

Here, Petitioner sought the identity of the confidential
informant in order to determine the identity of the person from
whom the informant had obtained the stolen gun.  Although Scott
Lipinski told police that he gave the gun to a stranger,
Petitioner's counsel argued that that was not a credible report,
and speculated that Lipinski might have given the gun to Nigel
Shrimpton or some other youth in their circle who could provide
information on the reason that Lipinski had obtained the gun.
Again, the purpose for seeking information about the intended use
for the gun was solely to attack the credibility of Scott
Lipinski and Nigel Shrimpton.  Thus, this is not a situation in
which the confidential informant has any direct information as to
the guilt or innocence of the defendant in a criminal action.
Instead, this situation involves speculation as to the knowledge
of the informant regarding matters relevant only to the
credibility of two eyewitnesses in a case involving numerous
eyewitnesses.  Although the evidence for concealing the
informant's identity on the basis of danger was slight, this is
not a case where refusal to order disclosure deprived Petitioner

of a fair trial.  As noted above, for the most part, the evidence
given by Scott Lipinski and Nigel Shrimpton was cumulative, and
Nigel Shrimpton's credibility already was subject to challenge
based upon his relationship to the victim.  The state courts'
determinations that Petitioner had failed to establish grounds
for disclosure sufficient to overcome the state's assertion of
danger are neither contrary to nor an unreasonable application of
clearly established federal law, nor are the state courts'
decisions based on an unreasonable determination of the facts in
light of the evidence presented.  Cf. United States v. Saa, 859
F.2d 1067, 1073 (2d Cir. 1988), cert. denied, 489 U.S. 1089
(1989) and 498 U.S. 870 (1990) (the fact that an informant might
cast doubt on the general credibility of a government witness
normally is an insufficient basis to overcome the informer's
privilege).  Petitioner is not entitled to relief on this claim.

   3.  Demonstrative Evidence

   The testimony of the prosecution witnesses established that
Petitioner had been holding the gun in his right hand when he
fired it.  The trial court rejected Petitioner's request to sign
his name in front of the jury, without being sworn or subjecting
himself to cross-examination, for the purpose of demonstrating
that he was left-handed and, thus, had not intentionally shot the
victim with the gun held in his right hand.  The trial court held
that the demonstration was testimonial and therefore denied

Petitioner permission to make the demonstration.  (Re19,

Transcript of April 11, 1996, at 123-38; Re21, Transcript of

April 16, 1996, at 12-14.)

Petitioner contends that he was deprived of his right to due

process by the trial court's refusal to permit him to demonstrate

his left-handedness before the jury without being subject to

cross-examination.  The Superior Court of New Jersey, Appellate

Division, rejected this argument on direct appeal.

We skip to defendant's third argument - that the
trial court erred by barring him from engaging in a
demonstration.  This contention is advanced against the
backdrop of the following facts.  The State's witnesses
testified that defendant used only his right arm in
firing the rifle.  Evidence indicated that such a
movement would be difficult because of the weight,
shape and size of the firearm.  Defendant wanted to
demonstrate to the jury that he was left-handed by
providing a writing sample which could be compared with
his signature on various court documents.  However,
defendant did not want to be cross-examined and thus
elected not to testify.  The trial court excluded the
proposed demonstration, reasoning that defendants'
preparation of a writing sample in the presence of the
jury would qualify as a "testimonial" act inconsistent
with his decision to invoke the Fifth Amendment
privilege by not taking the stand.

Defendant's argument must be considered within the
context of the historical roots from which the
privilege against self-incrimination had its genesis.
The Fifth Amendment privilege developed "as a reaction
to the practice in the early English courts of
compelling a witness to be sworn and give testimony
concerning his guilt or innocence."  State v. King, 44
N.J. 346, 357 (1965); see also Weintraub, Voice
Identification, Writing Exemplars and the Privilege
Against Self-Incrimination, 10 Vand. L. Rev. 485, 486-
90 (1957).  In the light of this history, text writers
and the overwhelming majority of the courts have
written that the Fifth Amendment privilege is not

implicated where the accused is placed in a lineup, or fingerprinted, or photographed, or examined for bodily characteristics, or compelled to provide a writing sample. <u>See, e.g.</u>, <u>Stovall v. Denno</u>, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); <u>Breithaupt v. Abram</u>, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1975); <u>State v. Cary</u>, 49 N.J. 343 (1967); <u>State v. Blair</u>, 45 N.J. 43 (1965).

Nevertheless, communicative behavior by an accused at trial may be considered "testimonial" notwithstanding the defendant's refusal to take the stand.  For example, in <u>State v. Fioravanti</u>, 46 N.J. 109 (1965), <u>cert. denied</u>, 384 U.S. 919, 86 S.Ct. 1365, 16 L.Ed.2d 440 (1966), our Supreme Court held that a demonstration by the accused, who had not taken the stand, constituted "testimonial" evidence, thereby waiving the prohibition against judicial and prosecutorial comment pertaining to the failure to testify.  At the conclusion of the case the defendant donned a pair of trousers allegedly taken from him during the crime and walked before the jury.  In his summation defense counsel argued that the pants could not have belonged to the accused because they did not fit.  In his instructions to the jury the trial judge commented on defendant's failure to take the stand.  On appeal, defendant argued that the trial court's comments contravened the principles mandated in <u>Griffin v. California</u>, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).[fn omitted]

Our Supreme Court held that the demonstration was "testimonial" in nature, principally because it sought to rebut portions of the State's proofs.  Noting that "one can communicate by gesture as effectively as by word," the Court found that defendant had "chose[n] to communicate with the jury."  <u>State v. Fioravanti</u>, 46 N.J. at 119.  The Court went on to state that "[i]t would distort the truth-finding process to expect the jurors to weigh what the defendant chooses to reveal and to be oblivious of his silence as to the remainder."  <u>Id.</u> at 118.  Citing <u>Caminetti v. United States</u>, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), the Court concluded that "when a defendant chooses to speak as to only a part of the direct proof against him" it may be inferred that "he is unable to dispute the balance."  <u>State v. Fioravanti</u>, 46 N.J. at 118.  That Fioravanti "chose a technique whereby he

succeeded in avoiding cross-examination," was said not
to preclude the judge and the prosecutor from
commenting upon his failure to answer or rebut the
state's proofs.  Id. at 119; see also State v. Schultz,
46 N.J. 254, 258, cert. denied, 384 U.S. 918, 86 S.Ct.
1367, 16 L.Ed.2d 439 (1966); State v. Bontempo, 170
N.J. Super. 220, 244 (Law Div. 1979).

     Fioravanti was decided twenty-four years ago.
Perhaps it is questionable whether the Court's holding
has any force of law today.  We can envision
circumstances under which strict application of
Fioravanti might seem unfair.  For example, were a
defendant to demonstrate that a glove left at the scene
of a crime does not fit his hand, could it be said that
the accused has waived his Fifth Amendment privilege,
thus subjecting him to comment on his failure to take
the stand?  So too, were a defendant to stand before
the jury to show that his physical dimensions are
inconsistent with a victim's description of the
culprit, would such a demonstration constitute
"testimonial" conduct, thereby constituting a waiver of
the accused's right to remain silent?

     We, of course, mean no disrespect to our Supreme
Court.  We merely stress that these are difficult
questions, and we do not know how the Court would
decide them today.  Fortunately, we need not explore
the continued vitality of Fioravanti or, for that
matter, its outermost parameters.  Assuming that the
trial court erred by barring defendant from engaging in
the proposed demonstration, we find that the error so
committed was harmless beyond a reasonable doubt.
Undoubtedly, there were other ways in which the defense
could have shown that defendant was left-handed.
Beyond this, we conclude that exclusion of the proposed
demonstration did not have the capacity to lead to an
unjust result.  R. 2:10-2.  The entire episode
represents only a few lines in a voluminous transcript
brimming with compelling evidence of defendant's guilt.
We are entirely satisfied that the demonstration, if
permitted, would not have changed the jury's verdict.

(Re3, Opinion of Appellate Division, at 7-11.)

     In applying the Self-Incrimination Clause of the
Fifth Amendment, the Supreme Court has recognized a
controlling distinction between real or physical

29

evidence obtained from a defendant's person and that
which is testimonial.  The Court has upheld action by
the state compelling an accused to submit to blood
tests, <u>Schmerber v. California</u>, 1966, 384 U.S. 757, 86
S.Ct. 1826, 16 L.Ed.2d 908; to try on clothing, <u>Holt v.
United States</u>, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed.
1021, and to exhibit his person for observation, <u>United
States v. Wade</u>, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18
L.Ed.2d 1149.  In addition, the Court has cited with
approval cases holding that the privilege against self-
incrimination 'offers no protection against compulsion
to submit to fingerprinting, photography, or
measurements, to write or speak for identification, to
appear in court, to stand, to assume a stance, to walk,
or to make a particular gesture.'  <u>United States v.
Wade</u>, <u>supra</u>, at 223, 87 S.Ct. at 1930, quoting from
<u>Schmerber v. California</u>, <u>supra</u>, 384 U.S. at 764, 86
S.Ct. at 1826.

<u>Mitchell v. Pinto</u>, 438 F.2d 814, 816-17 (3d Cir. 1970) (en banc),

<u>cert. denied</u>, 402 U.S. 961 (1971).  Thus, where the Self-

Incrimination Clause would not preclude compulsion to provide

real or physical evidence that is not testimonial or

communicative, a defendant can provide such evidence voluntarily

in a demonstration at trial, without that conduct being

analogized to testimony and constituting a waiver of the

privilege against testifying.  <u>Id.</u>[3]

---

[3] Only two years earlier, the Court of Appeals for the Third
Circuit had held that it was a testimonial act for a defendant to
don a pair of trousers, known to have been worn during the
commission of the crime, for the purpose of establishing that
they were substantially too large to be his.  <u>See</u> <u>Fioravanti v.
Yeager</u>, 404 F.2d 675 (1968).  The Court of Appeals specifically
noted that, to the extent the <u>Mitchell</u> rationale was inconsistent
with its own prior decision, the reasoning of the <u>Fioravanti</u>
opinion will not be followed.

Had Petitioner sought only to produce a handwriting exemplar, that act clearly would not have been testimonial and would have been permitted.  See, e.g., Gilbert v. California, 388 U.S. at 266-67; United States v. Wade, 388 U.S. at 222-23; Matter of Special Federal Grand Jury Empanelled Oct. 31, 1985, 809 F.2d. 1023 (3d Cir. 1987).  Here, however, Petitioner's proffer went far beyond the provision of a handwriting exemplar for identification purposes.  Here, Petitioner sought to write his signature in front of the jury for the purpose of demonstrating his left-handedness not in handwriting, but in other activities, including the aiming and firing of a rifle.  This proffer was testimonial.  Petitioner sought to be free from cross-examination as to his left-handedness in the activity and intent at issue in the trial.  The trial court did not err in excluding this demonstration as testimonial.

To the extent the trial court did err, the Appellate Division correctly found the error harmless.  Petitioner could have introduced evidence of his left-handedness through other witnesses.  Moreover, numerous witnesses saw Petitioner point and shoot the rifle.  Cf. Sarauer v. Frank, 2005 WL 1075617 *10-11 (W.D. Wis. May 5, 2005) (refusal to permit defendant to present photographic evidence without subjecting himself to wide-open cross-examination was subject to harmless error analysis).

31

The state court decisions are neither contrary to nor an unreasonable application of clearly established federal law.  Nor are they based on an unreasonable determination of the facts. Petitioner is not entitled to relief on this claim.

B.    Ineffective Assistance of Trial Counsel

Petitioner complains that he received ineffective assistance of trial counsel based upon counsel's (1) failure to present an intoxication defense, (2) failure properly to confront witnesses T. Swiecicki and S. Menits with their inconsistent statements to police, (3) conflict of interest due to his law firm's prior representation of police officers and township officials.

The conflict-of-interest claim was raised on direct appeal and rejected by the Appellate Division.

> We first address defendant's claim that he was
> denied the effective assistance of counsel because his
> trial attorney's law firm had represented Detective
> Thomas Collow, a prosecution witness, in an unrelated
> civil suit some four years before the trial.  It is
> undisputed that trial counsel did not participate in
> the prior civil action in any way, and that defendant
> was made aware of the relevant facts and had no
> objection.  We add that Detective Collow's role in the
> trial was extremely minimal.  The detective testified
> that he and another officer arrested defendant in New
> York City and that he witnessed defendant prepare a map
> showing where the murder weapon could be found.
> Collow's testimony was entirely cumulative, Detective
> Robert McGovern having recounted in detail the
> circumstances surrounding defendant's arrest and
> preparation of the map.
>
> We summarize the applicable principles.  It is
> axiomatic that both the Federal and New Jersey
> Constitutions afford an accused the right to have the
> untrammeled and unimpaired assistance of counsel.  See

32

Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942); State v. Bellucci, 81 N.J. 531, 538 (1980); State v. Land, 73 N.J. 24, 29-30 (1977); State v. Gren, 129 N.J. Super. 157, 161 (App. Div. 1974); State v. Ebinger, 97 N.J. Super. 23, 27 (App. Div. 1967).  These constitutional prescriptions mandate that a defendant should have nothing less than the undivided loyalty of his attorney.  Glasser v. United States, 315 U.S. at 70, 62 S.Ct. at 465, 86 L.Ed. at 699; State v. Bellucci, 81 N.J. at 538; State v. Land, 73 N.J. at 29-30.  In an unbroken line of decisions, both federal and state courts have said that the attorney's position as an advocate for his client should not be compromised before, during or after trial.  Von Moltke v. Gillies, 332 U.S. 708, 720-21, 68 S.Ct. 316, 322, 92 L.Ed. 309, 319 (1947); Williams v. Kaiser, 323 U.S. 471, 475, 65 S.Ct. 363, 366, 89 L.Ed. 398, 402 (1945); State v. Bellucci, 81 N.J. at 538; State v. Land, 73 N.J. at 31.

Most of the decisions pertaining to this subject have involved dual representation by a lawyer or a law firm.  The following rules have been developed.  If a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of co-defendants, a per se conflict arises and prejudice will be presumed absent a valid waiver.  State v. Norman, 151 N.J. 5, 24-25 (1997).  Otherwise, the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown to establish constitutionally defective representation.  Id. at 25 (citing State v. Bell, 90 N.J. 163, 171 (1982)).

Somewhat different principles apply where the law firm of a defendant's trial counsel has previously represented a prosecution witness.  Our Supreme Court has addressed the issue in two decisions.  In State v. Galati, 64 N.J. 572 (1974), a police officer was indicted for criminal offenses.  The Law Division granted the State's motion to disqualify the defendant's lawyer, who was regularly retained by the same local police benevolent association that defendant belonged to, because other police officers who were to be called as prosecution witnesses were also members of the association.  The Supreme Court granted leave to appeal and reversed the trial judge's order.  Id. at 578-79.

However, the Court adopted a rule to be applied in future cases disqualifying the association's lawyer. Id. at 578-79.  The Court noted that when the association's lawyer "undertakes the representation of a private cause in which a member of that same [association] is destined to testify (on one side or another) there is bound to occur a public suspicion that the [association] witness will be inclined to palliate or vivify his testimony in order to accommodate the lawyer who, outside the courtroom, is en rapport with and supportive of the private and organizational interest of the [association] witness." Id. at 576.  The Court said that "[t]he doubts thus engendered or suspicions aroused ... impoverish the appearance of justice and taint the image of law and its even-handed enforcement."  Ibid.; see also State v. Morelli, 152 N.J. Super. 67, 70 (App. Div. 1977); State v. Needham, 298 N.J. Super. 100, 103 (Law Div. 1996); State v. Catanoso, 222 N.J. Super. 641, 644 (Law Div. 1987).

More recently, the Court rendered its decision in State v. Purnell, 126 N.J. 518 (1992).  There, the Court addressed issues similar to those raised here. The law firm of defendant's trial counsel had previously represented a prosecution witness on a drug offense.  As here, the defense argued that because the firm's interests would prohibit defendant's lawyers from sharply cross-examining the firm's former client, the trial counsel's interest would be materially adverse to that of the accused.  Id. at 535.  The Court was not persuaded by this contention.  Emphasizing that the prior drug case was wholly unrelated to that of the defendant, the Court concluded that the defense attorney was not forced to choose between betraying his former client or compromising his duty to vigorously defend against the criminal charges.  Ibid.  The Court also stressed that the defendant had consented in open court to counsel's continued representation.  Id. at 536.

The facts here parallel those in Purnell.  Nothing in the record suggests that defense counsel was prevented from serving as a vigorous partisan of defendant's interests.  See State v. Bellucci, 81 N.J. at 541.  The attorney-client relationship between counsel's law firm and Detective Collow was not a continuing one.  Defense counsel had no interest to

curry favor with Collow or to betray his duty to
defendant by not cross-examining the witness
uninhibitedly.  Moreover, as we pointed out, Collow
played a minor role in the trial.  His testimony was
cumulative and added little or nothing to the State's
case.  And finally, defendant was apprised of the
relevant facts and consented to defense counsel's
continued representation.  There is no suggestion that
he was deceived or coerced into consenting.  We
perceive no violation of defendant's right to the
effective assistance of counsel under these
circumstances.

(Re3, Opinion of Appellate Division, at 3-7.)

Petitioner's other claims were rejected by the Appellate

Division on appeal from the denial of post-conviction relief.

In order to establish a prima facie case of
ineffective assistance of counsel, a defendant must:
(1) demonstrate that counsel's performance was so
deficient that he "was not functioning as the 'counsel'
guaranteed by the Sixth Amendment"; and (2) establish
that the attorney's deficient performance prejudiced
the defense so as to deprive the defendant of a fair
trial.  Strickland v. Washington, 446 U.S. 668, 687,
104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 91984); see
also State v. Fritz, 105 N.J. 42 (1987) (adopting the
Strickland standard in New Jersey).  A prima facie
claim of ineffective assistance of counsel requires
defendant to allege facts sufficient to demonstrate
counsel's alleged substandard performance.  State v.
Cummings, 321 N.J. Super. 154, 168-69 (App. Div.),
certif. denied, 162 N.J. 199 (1999).  Mere naked
assertions are insufficient to establish a prima facie
claim.  Ibid.

Defendant argues that trial counsel failed tomake
an intoxication defense and failed to conduct a
reasonable cross-examination of critical witnesses.
Alternatively, he maintains that the cumulative effect
of the ineffective assistance at trial resulted in the
imposition of an unjust sentence.

Defendant's claim that counsel failed to pursue an
intoxication defense is belied by the record.
Witnesses testified that defendant had been drinking,

and counsel, in summation, argued that defendant's drinking precluded him from having the requisite mental state to commit murder.

Furthermore, defendant asserts that trial counsel did not fully investigate the case, and was therefore ineffective, because he did not subpoena the register tapes from the store where the defendant purchased alcohol. However, "when a petitioner claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or person making the certification." Cummings, supra, 321 N.J. Super. at 170. Here, defendant has made no showing of what information would have been obtained had trial counsel subpoenaed the register tapes.

Defendant also claims that counsel failed to effectively cross-examine Thomas Swiecicki and Stephen Henits. Specifically, defendant argues that counsel failed to question Swiecicki about the differences between the statements Swiecicki gave to police and his testimony at trial, and that counsel failed to challenge Henits's characterization of how the rifle was used, namely whether defendant pointed or aimed the rifle at victim.

Swiecicki told police that he did not see the shooting. In his statement to police he said that he was sitting on the bleachers at the basketball court when he heard a pop and then heard Chris's body hit the ground. At trial Swiecicki again testified on direct that he "heard a pop from the gun." The only difference between the two statements is that in speaking with the police Swiecicki stated that defendant ran into the woods, while at trial Swiecicki stated that defendant rode off down the street on a bike. However, defendant does not take issue with this. Rather, defendant claims that Swiecicki told police that he did not witness the shooting and then testified at trial that he did. The record does not support defendant's claim. Swiecicki at all times maintained that he did not see the shooting, but heard the shot and saw defendant fleeing the scene. Thus, defendant cannot show that trial counsel's performance was deficient or that defendant was in any way prejudiced.

      Similarly, Henits's testimony is consistent with that given by all of the boys at the basketball court the night of the murder.  None of the witnesses discussed whether defendant pointed or aimed the rifle at the victim.  They all stated, as Henits did, that defendant rode up on a bicycle, fired one shot at the victim, and left the scene.  There is no support for a claim of ineffective assistance of counsel.

(Re11, Appellate Division Opinion of November 5, 2004, at 3-6.)

      The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

      To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> at 694.  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Id.</u> at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that,

absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

Cuyler v. Sullivan, 446 U.S. 335, 346-50 (1980), establishes the test for evaluating a conflict of interest claim.[4]  Pursuant

---

[4] Although Cuyler involved a conflict of interest claim arising out of an attorney representing both the defendant and co-defendants, the test is the same in a claim that the conflict arising from a defense attorney's firm's prior representation of a state's witness.  See, e.g., Government of Virgin Islands v.

38

to Cuyler, a trial court is obliged to investigate any timely objections to multiple representation; if the trial court permits the defendant to show that the conflict will result in an unfair trial, a reviewing court cannot presume that the possibility for conflict resulted in ineffective assistance of counsel.  If the defendant raised no objection at trial, he establishes a constitutional violation only if he shows that an actual conflict of interest adversely affected his lawyer's performance.  A defendant who shows that a conflict of interest actually affected the adequacy of counsel's representation need not demonstrate prejudice.  Id.; see also Mickens v. Taylor, 535 U.S. 162 (2002).

The Appellate Division's determination that there was no ineffective assistance based upon counsel's firm's prior representation of one witness, who played a minor role and whose testimony was cumulative, is not contrary to or an unreasonable application of the Cuyler rule.  Cf. Purnell, 2005 WL 1523144 at *10-11.  Petitioner is not entitled to relief on this claim.

With respect to Petitioner's other claims of ineffective assistance, the decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law as set forth in Strickland, nor was it based on an unreasonable determination of the facts in light of

---

Zepp, 748 F.2d 125, 135 (3d Cir. 1984); Purnell v. Hendricks, 2000 WL 1523144 *10, n.10 (D.N.J. Oct. 16, 2000).

the evidence presented.   Petitioner is not entitled to relief on these claims.

C.   <u>Jury Instructions</u>[5]

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.   Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."   It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.   In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.   And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."   "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

<u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991) (citations omitted).   Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of

---

[5] Respondents contend that the jury instruction claims are not exhausted because they were not framed in federal constitutional terms before the state courts.   To the contrary, Petitioner clearly asserted these claims in federal constitutional terms before both the Appellate Division and the Supreme Court of New Jersey.   <u>See</u> Re1, Appellate Division Brief of Petitioner at 18, 26; Re4, Letter-Petition on Behalf of Petitioner before Supreme Court of New Jersey, at 11, 18. Accordingly, this Court will address the jury instruction claims on the merits.

proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997). See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge. If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

<u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (internal
quotations and citations omitted).

However, a jury instruction that "reduce[s] the level of
proof necessary for the Government to carry its burden [of proof
beyond a reasonable doubt] is plainly inconsistent with the
constitutionally rooted presumption of innocence." <u>Cool v.
United States</u>, 409 U.S. 100, 104 (1972). "[T]rial courts must
avoid defining reasonable doubt so as to lead the jury to convict
on a lesser showing than due process requires." <u>Victor v.
Nebraska</u>, 511 U.S. 1, 22 (1994); <u>see also</u> <u>Cage v. Louisiana</u>, 498
U.S. 39, 41 (1990). As the Supreme Court explained in <u>Victor</u>,

> so long as the court instructs the jury on the
> necessity that the defendant's guilt be proved beyond a
> reasonable doubt, the Constitution does not require
> that any particular form of words be used in advising
> the jury of the government's burden of proof. Rather,
> taken as a whole, the instructions [must] correctly
> conve[y] the concept of reasonable doubt to the jury.

<u>Victor</u>, 511 U.S. at 6 (citations and internal quotation marks
omitted).

"[A] misdescription of the burden of proof ... vitiates <u>all</u>
the jury's findings. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281
(1993) (emphasis in original). Such an error is considered
structural and thus is not subject to harmless error review. <u>See
id.</u> at 280-82. <u>But see</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-11
(1999) (applying harmless-error analysis where jury was not
instructed on an element of an offense).

1.   <u>Failure to charge passion/provocation homicide</u>

At trial, some evidence was presented that the victim had, on the evening he was killed, tried to goad Petitioner into a fight.  One witness described the victim as "real pissed off" and said that "[h]e wanted to fight George and he wanted to get it over with and finish fighting him or something."  (Re15 at 36, 115-16, 250.)  The victim rode his bike to Petitioner's house and challenged Petitioner to fight him.  Petitioner did not respond and the victim's brother Nigel told him to leave.  (Re14 at 92-95; Re15 at 36, 73,; Re16 at 10-11, 25-26.)  At the victim's behest, two or three more times that evening, the victim's friend Eddie Wright went to Petitioner's house to tell him that the victim wanted to fight; each time, Petitioner indicated that he was not interested.  (Re14 at 96; Re15 at 37-44, 74, 115, 178-79, 196-97, 250-51; Re16 at 10-12, 26-27, Re17 at 57.)  Fifteen to 20 minutes after Wright's last visit, Petitioner announced that he was going to the store and left on his bike.  (Re15 at 96-97; Re15 at 197-201; Re16 at 12-13, 27; Re17 at 57-58.)  Instead of going to the store, he went to a basketball court, where the victim was hanging out with his friends, and shot him.

Petitioner specifically declined to request a jury charge on passion/provocation manslaughter.  (Re21 at 29-30.)  Petitioner now contends that the trial court should have given such a charge

43

anyway.  The Appellate Division rejected this claim without opinion.

In Beck v. Alabama, 447 U.S. 625, 635 (1980), the Supreme Court held that, in a capital case, a trial court must give a requested charge on a lesser included offense where it is supported by the evidence.  The Court left open the question of whether instructions on lesser included offenses were required in non-capital cases.  Id.  The Court of Appeals for the Third Circuit has held that trial courts must charge a lesser included offense so that the jury does not convict a defendant of a crime more serious than the jury believes the defendant actually committed merely because the jury believes the defendant had some degree of involvement and does not want to set the defendant free.  Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988) (citing Keeble v. United States, 412 U.S. 205, 212-13 (1973)).  But see Geschwendt v. Ryan, 967 F.2d 877, 884 n.13 (3d Cir.) (observing that the Supreme Court, in Schad v. Arizona, 501 U.S. 624 (1991), cast doubt on the theory that due process requires the court to instruct on a lesser included offense in non-capital offenses), cert. denied, 506 U.S. 977 (1992).  Other circuits have held that the failure to give lesser included offense instructions in a non-capital case does not present a constitutional question.  See Pitts v. Lockhart, 911 F.2d 109,

44

112 (8th Cir. 1990), <u>cert. denied</u>, 501 U.S. 1253 (1991); <u>Bonner v. Henderson</u>, 517 F.2d 135, 136 (5th Cir. 1975).

Under New Jersey law, an instruction as to a lesser offense is warranted where the facts provide a rational basis for such a conviction.  N.J.S.A. 2C:1-8e ("The court shall not charge the jury with respect to a lesser included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."); <u>State v. Choice</u>, 98 N.J. 295, 298-99 (1985).  However, a charge on a lesser included offense should not be given where it would invite the jury to engage in sheer speculation.  <u>State v. Mendez</u>, 252 N.J. Super. 155, 159 (App. Div. 1991), <u>certif. denied</u>, 127 N.J. 560 (1992).

This Court observes that the states are free to define criminal offenses in any way they see fit, within certain constitutional limitations, even through their lower courts. <u>Smith v. Horn</u>, 120 F.3d 400, 415 (1997) (citing <u>Johnson v. Rosemeyer</u>, 117 F.3d 104 (3d Cir. 1997)), <u>cert. denied</u>, 522 U.S. 1109 (1998).  Here, state law defines passion/provocation manslaughter as a "[h]omicide which would otherwise be murder under section 2C:11-3 [that] is committed in the heat of passion resulting from a reasonable provocation." <u>See</u> <u>State v. Grunow</u>, 102 N.J. 133, 138-40 (1986); N.J.S.A. 2C:11-4b(2) .  The test for passion/provocation is an objective one.  <u>State v. Mauricio</u>, 117 N.J. 402, 411 (1990); <u>see also</u> <u>State v. Pratt</u>, 226 N.J. Super.

307, 317 (App. Div. 1988).  There are four elements necessary to demonstrate passion/provocation manslaughter: 1) adequate provocation; 2) lack of time to cool off between provocation and slaying; 3) defendant must have actually been provoked; and, 4) defendant must not have actually cooled off before the slaying. The provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his control.  State v. King, 37 N.J. 285, 301-02 (1962).  However, "a course of ill-treatment" rather than a single event can constitute adequate provocation. State v. Guido, 40 N.J. 191, 211 (1963).

The decision not to give a passion/provocation instruction did not deprive petitioner of a fair trial.  Under New Jersey law, words alone do not constitute adequate provocation to reduce murder to manslaughter.  See, e.g., State v. Mauricio, 117 N.J. at 413; State v. Crisantos, 102 N.J. 265, 274 (1986); State v. Bonano, 59 N.J. 515, 524 (1971); State v. Ruscingno, 217 N.J. Super. 467, 472 (App. Div.), certif. denied, 108 N.J. 210 (1987). In addition, an instruction on passion/provocation manslaughter would have been contrary to the defense strategy of intoxication and recklessness.  As the refusal to instruct on passion/provocation manslaughter conformed to state law, there was no due process deprivation.  Petitioner is not entitled to relief on this claim.

46

2.   <u>Failure to give a proper "flight" charge</u>

The trial court gave, essentially, the model charge on "flight."

> There has always been testimony in this case from which you may infer that the defendant George Corbett fled shortly after the alleged commission of the crime. The question of whether the defendant fled after the commission of the crime is another fact, another question of fact for your determination.  I tell you that mere departure from a place where a crime has been committed does not constitute flight.  If you find that the defendant fearing an accusation or arrest would be made against him on the charge involved in the indictment that he took flight -- strike that, that he took refuge in flight for the purpose of evading the accusation arrest on that charge then you may consider such flight in connection with all of the other evidence in this case as an indication or proof of consciousness of guilt.  Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving the scene was to evade accusation or arrest for the offense charged in the indictment.  It is for you as judges of the facts to decide whether in fact that evidence of flight shows a consciousness of guilt and it is for you as judges of the facts to determine the weight to be given to that evidence in light of all of the other evidence in the case.

(Re22, Transcript of April 17, 1996, at 12-13.)  Petitioner contends that the court's instruction suggests that a finding of flight may be proof of a consciousness of guilt only of murder, as opposed to a lesser offense of aggravated or reckless manslaughter.  The Appellate Division rejected this claim without opinion.

Whether the instruction is correct under state law, there is no error so great as to have deprived Petitioner of a fair trial.

47

The instruction on flight did nothing to shift the burden of proof.  Petitioner is not entitled to relief on this claim.

IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.

s/William J. Martini

_____
William J. Martini
United States District Judge

Dated: 8/22/06

48